1

2

3

4                                                    **E-FILED on    5/11/10    **

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12   KLA-TENCOR CORPORATION, a Delaware          No. C-09-01922 RMW
     corporation,
13
                    Plaintiff,
14
            v.                                    ORDER DENYING PLAINTIFF'S MOTION
15                                                FOR PARTIAL SUMMARY JUDGMENT
                                                  AND DENYING DEFENDANT'S MOTION
16   BRIAN MURPHY, RENWICK THOMPSON,              TO STAY
     PETER HOOPER, RUIXIA CHEN, and
17   INSPECSTAR, LLC, a California limited        **[Re Docket No. 51]**
     liability company,
18
                    Defendants.
19

20

21

22          Plaintiff KLA-Tencor Corp. ("KT" or the "company") bought this action against individual

23   defendants Brian Murphy, Renwick Thompson, Peter Hooper, and Ruixia Chen, and corporate

24   defendant InspecStar, LLC ("InspecStar") for alleged trade secret misappropriation and destruction

25   of KT's confidential information.  Since plaintiff filed the present motion, it has reached settlement

26   with three of the defendants, Murphy, Thompson, and Hooper, and dismissed them from the case.[1]

27   _____

28   [1]  To the extent plaintiff moved for summary judgment with respect to these former defendants, the
     court denies the motion as moot.

     ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION
     TO STAY—No. C-09-01922 RMW
     LJP

United States District Court
For the Northern District of California

1  With respect to the remaining defendants Chen and InspecStar, plaintiff moves for partial summary

2  judgment on Counts One, Two, Three, and Eight of the complaint.  Defendants oppose the motion.

3  In addition, defendant InspecStar requests a stay of proceedings.  Argument was heard on the motion

4  on November 20, 2009.  The court has read the moving and responding papers and considered the

5  arguments of counsel.  For the reasons set forth below, the court denies without prejudice plaintiff's

6  motion for partial summary judgment and denies InspecStar' request for a stay.

**I. BACKGROUND**

8  This case arises out of conduct by former employees and contractors of KT.  Plaintiff asserts

9  nine causes of action against various defendants, including trade secret misappropriation, common

10 law unfair competition, violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, and breach of contract.

11 Plaintiff now seeks summary judgment on the following counts: Count One against Chen for

12 violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; Count Two

13 against Chen for violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §

14 2701, *et seq.*; Count Three against InspecStar for trade secret misappropriation in violation of Cal.

15 Civ. Code § 3426, *et seq.*; and Count Eight against Chen for breach of contract.

**A.    Procedural History**

17 This action was filed on May 4, 2009.  The court issued a temporary restraining order the

18 same day at 6:30 p.m. prohibiting defendants from using KT's trade secrets or destroying evidence

19 and requiring defendants to preserve electronic evidence.  In addition, the court granted plaintiff

20 leave to take expedited discovery, including oral depositions of the individual defendants.  After a

21 hearing, the court entered a preliminary injunction on June 6, 2009.

22 Since this action was filed, InspecStar has consistently asserted a Fifth Amendment privilege

23 against self-incrimination and refused to provide information or documents relating to plaintiff's

24 claims.[2]  Decl. Carla B. Oakley Supp. Pl.'s Mot. Partial Summ. J. ("Oakley Decl.") ¶¶ 2-5, 8-10 &

25 Ex. A-C, F-G.  Chen also initially asserted her Fifth Amendment privilege, at her deposition on May

26 15, 2009 and during efforts to mediate pursuant to the court's order at the May 22, 2009 preliminary

27
28

[2]  The propriety of InspecStar's assertion of the Fifth Amendment as a corporate entity is further discussed below in Part II.E.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STAY—No. C-09-01922 RMW
LJP

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    injunction hearing. *Id.* ¶ 7 & Ex. D; Declaration of Carla B. Oakley Supp. Pl.'s Reply ("Oakley

2    Reply Decl.") ¶ 2.  However, after plaintiff filed the present motion, Chen authorized plaintiffs to

3    obtain a copy of her computer hard drive image and to conduct a search of the hard drive.  Oakley

4    Reply Decl. ¶ 4.  Chen has also submitted a declaration in opposition to the motion.  Decl. Ruixia

5    Chen Supp. Opp. Pl.'s Mot. Partial Summ. J. ("Chen Decl.").[3]

6        **B.    Factual Record**

7            **1.    KLA-Tencor**

8            KT is a supplier of process control and yield management solutions for the semiconductor

9    and related microelectronics industries.  Decl. Dean Schmidt Supp. Pl.'s Mot. Partial Summ. J.

10   ("Schmidt SJ Decl.") ¶ 3.  KT offers tools used in semiconductor manufacturing processes and

11   complementing support, maintenance, and warranty services.  *Id.* ¶ 4.  KT employs more than 1,000

12   certified engineers worldwide in order to provide these services.  *Id.*

13           KT takes various steps to protect the confidentiality of materials and information that are

14   valuable to its business including: requiring employees to sign confidentiality agreements; restricted

15   access to the company's computer networks; restricted access to each individual's computer or

16   laptop; marking documents as "confidential"; requiring nondisclosure agreements with customers

17   and vendors; limiting access to technical and business information on a need-to-know basis;

18   providing training to employees on KT's confidentiality policies and restrictions on usage of KT

19   information; and maintaining a security team that routinely monitors the security of its networks and

20   electronic communications to detect dissemination of company materials and information.  *Id.* ¶ 5.

21   Types of information KT maintains as confidential include: service manuals containing detailed

22

23   [3]  Plaintiff objects to the contents of Chen's declaration and in addition asks that it be stricken in its
     entirety because Chen refused to provide discovery earlier in the case.  The court finds that the
24   evidentiary objections do not provide a basis for excluding the challenged portions of the
     declaration.  In addition, the court finds it inappropriate to strike the declaration at this time in light
25   of the fact that Chen now appears willing to provide discovery and thus "[t]he opportunity to combat
     the newly available testimony" still exists.  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910
26   (9th Cir. 2008) (quoting *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) and noting
     courts generally do not allow a party to testify *at trial* where he has invoked his Fifth Amendment
27   privilege at deposition).  Plaintiff may revisit the issue should Chen no longer be cooperative.  *See
     United States v. Parcels of Land*, 903 F.2d 36, 42-43 (1st Cir. 1990) (finding district court properly
28   struck claimant's affidavit where his offering the affidavit led government to withdraw its motion for
     summary judgment in order to depose him but he then invoked the Fifth Amendment).

1  information on how to test and service wafer fabrication tools; product architecture files; business

2  strategy files; financial files containing information about expenses, costs, revenues, forecasts, and

3  other financial metrics; customer files; service and maintenance history files; service training

4  documents; and organization structure information related to the technical capabilities and training

5  of KT personnel.  *Id.* ¶ 6.  According to KT, this information cannot be purchased or derived from

6  publicly available sources and is not generally known in the industry.  *Id.* ¶ 7.  If disclosed to

7  competitors or third parties, this information could allow them to provide competitive services to KT

8  customers, interfere with customer relationships, or underbid KT for competing products and

9  services.  *Id.*

10              **2.      Ruixia Chen**

11              Chen was a KT employee from December 2000 until October 13, 2008.  Schmidt SJ Decl.

12  ¶¶ 24-25.  When she joined the company, she signed a proprietary information and inventions

13  agreement, which in part provided:

> **1. Confidentiality.**  During the course of my employment at KLA-Tencor I may have
> access to confidential information, including, but not limited to, information about
> customers, vendors, KLA-Tencor's design & engineering data, financial and
> personnel data, lists of employees and proprietary information given to KLA-Tencor
> by other companies pursuant to confidential disclosure agreements.  It is understood
> that although not all such data may have a proprietary legend, KLA-Tencor considers
> all such information proprietary.  *I agree to keep confidential*, except as the Company
> may otherwise consent in writing *and not to disclose, or make any use of except for
> the benefit of the Company, any trade secrets, confidential information, knowledge,
> data or other information* of the Company relating to products, processes, know how,
> designs, formulas, test data or other matter pertaining to any business of the company
> or any of its clients, customers, consultants, licensees or affiliates, which I may
> produce or obtain as herein provided.  This provision shall survive my business
> relationship but shall not apply after information has been voluntarily disclosed to the
> public, independently developed and disclosed by others, or otherwise enters the
> public domain through lawful means.
>
> . . . .
>
> **3. Return of Confidential Material.**  In the event of the termination of my business
> relationship with the Company for any reasons whatsoever, *I agree to promptly
> surrender and deliver* to the Company all records, Company proprietary information
> including, but not limited to, drawings, documents and data of any nature pertaining
> to any invention, trade secret or confidential information of the company or to my
> business relationship, *and I will not take with me* any description containing or
> pertaining to any confidential information, knowledge or data of the Company which
> I may produce or obtain during the course of my business relationship.

**United States District Court**
For the Northern District of California

1  *Id.* ¶ 26; Ex. L. (emphasis added).  The agreement also provided that during her employment and for

2  a period of one year afterwards, Chen would not (1) solicit or encourage any KT employees to work

3  elsewhere, (2) use or disclose without authorization the names or addresses of any KT customers, or

4  (3) call on, solicit, or attempt to solicit any of KT's customers or their businesses on behalf of herself

5  or any other person or entity.  *Id.*

6      Chen held positions in both engineering and customer service.  *Id.* ¶ 24.  Murphy was her

7  supervisor from August 2004 to July 2005, during which both worked in China.  *Id.*  In her various

8  positions, Chen had access to confidential KT information.  *Id.* ¶ 26.  On August 13, 2008, Chen was

9  formally notified that she would be laid off effective October 13, 2008.  *Id.* ¶ 25.  On October 13,

10  her last day at work, she underwent termination procedures reminding her not to copy data or take

11  home discs and a certification that she had returned all KT property or materials in her possession or

12  control.  *Id.* ¶ 25 & Ex. K.

13      After Chen left, the hard drive of Chen's work-assigned computer was examined by KT's

14  computer security team and outside forensic experts at Pinkerton.  Gurule SJ Decl. ¶ 9; Mock SJ

15  Decl. ¶ 4.  It was discovered that Chen had deleted all of the e-mails in her e-mail account prior to

16  leaving KT.  Gurule SJ Decl. ¶ 9.  The forensic examiner found that Chen had installed a program

17  called Evidence Eliminator ("EE").  Decl. Cory Mock Supp. Pl.'s Mot. Partial Summ. J. ("Mock SJ

18  Decl.") ¶ 23.  EE is a software cleaning/wiping program that is used to securely delete data so that it

19  is not recoverable or viewable and so that user activity cannot be traced.  *Id.* ¶ 8.  KT does not

20  permit its employees to install EE or any other data deletion program on KT-issued computers.

21  Decl. Jeffrey J. Gurule Supp. Pl.'s Mot. Partial Summ. J. ("Gurule SJ Decl.") ¶ 12.  Moreover, Chen

22  appeared to have installed EE using a license code and username that comes with an illegal version

23  that can be obtained from peer to peer file sharing websites on the internet.  Decl. Cory Mock Supp.

24  Pl.'s Reply ("Mock Reply Decl.") ¶¶ 8-9.  EE was installed on Chen's computer on October 12, 2008

25  at 10:03 p.m. and deleted on October 13, 2008 at 7:26 a.m.  Mock SJ Decl. ¶ 23.  Many files

26  appeared to have been deleted by EE, including documents, e-mails, and files related to internet

27  history.  *Id.* ¶ 24.  In particular, many link files appeared to be missing.  *Id.* ¶ 25.  Link files show

28  when a user accessed files and the original location of the file being accessed.  *Id.*  Some of the

1   recovered link files referenced removable devices and what appeared to be company files. *Id.* Chen

2   claims that she used EE in an attempt to securely delete personal information from her computer

3   because she was aware that company computers returned by departing employees were generally

4   reissued to other employees. Chen Decl. ¶ 5. Chen denies that she deleted any of KT's proprietary

5   data. *Id.* ¶ 6.

6       Examination of her computer's hard drive revealed that Chen had accessed a number of files

7   on October 13, including product and customer service analyses that KT considers confidential.

8   Mock SJ Decl. ¶ 26 & Ex. V-Z; Schmidt SJ Decl. ¶ 28. The USB driver history indicated that at

9   10:31 a.m., after the files were accessed and after EE had been deleted from the computer, an

10  external 500 gigabyte storage device had been connected to the computer. Mock SJ Decl. ¶ 26. The

11  examiner concluded that "files were probably copied over to a removeable storage device." *Id.*, Ex.

12  C at 22. Chen denies that she copied or downloaded company data or connected a 500 gigabyte

13  USB device to her computer. Chen Decl. ¶ 7. According to Chen, she only copied photographs and

14  other personal information. *Id.*

15      An in-house KT forensics engineer reviewed a copy of a forensic image of Chen's personal

16  computer hard drive that was made at Chen's home on May 8, 2009 during execution of this court's

17  temporary restraining order. Declaration of Jonathan Joe Supp. Pl.'s Reply ("Joe Reply Decl.") ¶¶ 1-

18  2, Oakley Reply Decl. ¶ 4. The hard drive contained files belonging to KT, some labeled

19  "confidential." Joe Reply Decl. ¶¶ 5-7 & Ex. A, D, E; Declaration of Dean Schmidt Supp. Pl.'s Mot.

20  File Under Seal (Ex. A-F of Joe Decl.) ¶ 4. The laptop also contained a file called "InspecStar

21  Planning.xls" in a folder called "Ruixia." Joe Reply Decl. ¶ 6.

22              **3.    InspecStar**

23      InspecStar is a California limited liability company founded on January 7, 2009. Oakley SJ

24  Decl., Ex. I. Previously, counsel for InspecStar and now-former defendant Thompson indicated to

25  the court that InspecStar "is basically owned by two defendants." *Id.*, Ex. J at 33:9-10. Plaintiff

26  asserts that these are two former defendants are Thompson and Murphy. Motion at 6:2-3.

27  According to his profile on the website "LinkedIn," Thompson is the president at InspecStar, LLC,

28  which he describes as an "[e]xpert service organization specializing in metrology and inspection

1    equipment."  Oakley SJ Decl., Ex. H.  Thompson formerly held a senior position at Vignani

2    Technologies Private Ltd., a company that handled various highly confidential product development

3    and documentation activities for KT.  Schmidt SJ Decl. ¶ 15.  Murphy and Thompson worked

4    together on KT-related matters.  *Id.* ¶ 15.

5          On February 17, 2009, former defendant Hooper[4] contacted Jason Johnstone, a KT

6    employee, and the two met for lunch.  Declaration of Jason Johnstone Supp. Pl.'s Mot. TRO

7    ("Johnstone Decl.") ¶ 3.  During lunch, Hooper stated that Murphy was starting a new company and

8    looking to hire someone with Johnstone's experience.  *Id.* ¶ 4.  Hooper said Murphy already had

9    eight employees or contractors signed up to work at the new company, including William Tyler

10   Bishop, a KT employee who had been laid off at the same time as Hooper and was Hooper's

11   supervisor at the time.  *Id.* ¶ 5.  Hooper also said that the new company was receiving financial

12   backing from Thompson, who had met with several of KT's customers including Micron

13   Technology, Inc., and Texas Instruments.  *Id.* ¶ 7.  Hooper said that Murphy could not attend those

14   meetings or be publicly mentioned in connection with the new company until after April 13, 2009

15   due to his KT severance requirements.  *Id.* ¶ 8.  Based on Hooper's comments, Johnstone surmised

16   that Texas Instruments had been advised that Murphy would be involved in the new company and

17   Murphy had used his relationship working with Texas Instruments while at KT to help set up the

18   meeting.  *Id.*

19         In March 2009, Johnstone was told by coworkers that Hooper had been calling them to ask

20   for KT customer contact information.  *Id.* ¶ 10.  Other KT employees also reported being solicited

21   by Murphy and Hooper to join InspecStar and being asked whether they had any KT tooling

22   equipment or KT documents.  Schmidt SJ Decl. ¶ 14.

## II. ANALYSIS

24         Plaintiff moves for summary judgment on Counts One, Two, Three, and Eight as to each

25   defendant named in those counts.  Defendant Chen opposes on the merits.  InspecStar opposes and

26   brings a "counter-motion to stay proceedings" on the grounds that it has asserted its Fifth

---

[4]  Hooper, a former KT employee, was notified on February 10, 2009 that he would be laid off
effective April 13, 2009, and February 10 was his last day in the office.  Schmidt SJ Decl. ¶ 29.

1    Amendment privilege against self-incrimination and has thus been precluded from offering any

2    evidence in opposition to plaintiff's motion.

3    **A.    Legal Standards**

4    Summary judgment is appropriate when "the pleadings, the discovery and disclosure

5    materials on file, and any affidavits show that there is no genuine issue as to any material fact and

6    that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Where, as here,

7    the movant has the burden of persuasion at trial, it must "establish beyond controversy every

8    essential element of its . . . claim."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir.

9    2003) (internal quotations and citation omitted).  The nonmoving party "can defeat summary

10   judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find

11   in its favor."  *Id.*  All justifiable inferences from the evidence are to be drawn in favor of the

12   nonmoving party.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456

13   (1992).

14   However, when parties invoke the Fifth Amendment in a civil case, as they are free to do,

15   "the court is equally free to draw adverse inferences from their failure of proof."  *SEC v. Colello*,

16   139 F.3d 674, 677 (9th Cir. 1998).  At the same time, there must be "evidence in addition to the

17   adverse inference to support a court's ruling."  *Id.* at 678; *Doe v. Glanzer*, 232 F.3d 1258, 1264 (9th

18   Cir. 2000) (noting "an adverse inference can be drawn when silence is countered by *independent*

19   *evidence* of the fact being questioned," but not when silence is the answer to an allegation contained

20   in a complaint).  Thus, the burden remains on the proponent of a fact to "come forward with

21   evidence to support the allegation, otherwise no negative inference will be permitted."  *Doe v.*

22   *Glanzer*, 232 F.3d at 1264.

23   **B.    Stay**

24   Murphy and InspecStar ask this court to stay proceedings in order to allow any potential

25   criminal matters to proceed. These defendants maintain that they will continue to assert the Fifth

26   Amendment while the threat of criminal liability remains and argue that allowing this case to

27   proceed would therefore result in substantial prejudice to them.  However, there is no indication that

28   any criminal investigation has occurred or any criminal charges are being considered.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1     Even where a criminal proceeding is underway, a stay is discretionary and granted only when

2 it would serve the interests of justice. *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th

3 Cir. 1995) ("The Constitution does not ordinarily require a stay of civil proceedings pending the

4 outcome of criminal proceedings."). Defendants have not cited any cases where, in the absence of

5 any hint of criminal proceedings, a court has nonetheless stayed civil proceedings due to invocation

6 of the Fifth Amendment. Moreover, "[a] defendant has no absolute right not to be forced to choose

7 between testifying in a civil matter and asserting his Fifth Amendment privilege." *Id.* at 326. Thus,

8 the mere fact that defendants have been put to such a "Hobson's choice," Defs.' Opp. at 4:18, is

9 insufficient to justify a stay.

10     In their papers, defendants modestly request a stay for 120 days after which "the parties can

11 revisit an additional stay of the proceedings and/or setting this motion back on the Court's calendar

12 for briefing and hearing." *Id.* at 6. However, in their reasoning, defendants are advocating nothing

13 less than a stay until all potentially applicable criminal statutes of limitations have run. The

14 arbitrariness in the length of the initial stay is shown by the fact that at oral argument counsel

15 suggested 90 days instead of 120 days. Counsel also conceded that, at the expiration of any stay,

16 they would probably request an additional stay if the situation with respect to criminal charges had

17 not changed. On the current facts, the court cannot justify granting an indefinite stay nor a series of

18 shorter stays that amount to the same thing.

19     **C.**    **Count One: Violation of the CFAA**

20     The CFAA creates liability for an individual who "intentionally accesses a computer without

21 authorization or exceeds authorized access, and thereby obtains . . . information from any protected

22 computer" or who "knowingly causes the transmission of a program, information, code, or

23 command, and as a result of such conduct, intentionally causes damage without authorization, to a

24 protected computer." 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(A). The definition of "protected

25 computer" includes a computer that is used in or affects interstate commerce. *Id.* § 1030(e)(2)(B).

26 Plaintiff argues that Chen violated the CFAA by using Evidence Eliminator to delete files on her

27 laptop.

28

The CFAA creates a civil right of action for persons who suffer damage or loss from a violation. *Id.* § 1030(g). A civil action may only be brought if the conduct involves one of the factors set forth in subsection (c)(4)(A)(i). *Id.* Plaintiff brings this suit pursuant to factor (I): loss to one or more persons during a one-year period aggregating at least $5,000 in value. *Id.* § 1030(c)(4)(A)(i)(I). Loss is defined broadly as

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*Id.* § 1030(e)(11). Plaintiff presents evidence that it paid forensics experts and security consultants more than $5,000 to investigate Chen's activities. Gurule SJ Decl. ¶ 11. These costs include the time spent analyzing hard drive data, preparing a forensics report, and explaining the results of the forensics analysis. *Id.*

The loading of a program onto a computer, whether by disk or internet download, constitutes a "transmission" under 18 U.S.C. § 1030(a)(5)(A)(i). *Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418, 419-20 (7th Cir. 2006). In addition, the deletion of data constitutes "damage," which is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Plaintiff has presented evidence that Chen loaded EE onto her computer, installed it under her user profile, and used it to delete files. However, there is an issue as to whether the deletion of files, i.e. the "damage," was caused without authorization.

Plaintiff argues that the agreements requiring surrender of all proprietary information upon termination of employment mean that KT employees are not authorized to delete confidential KT information residing on their computers. As an initial matter, it is unclear to the court that the relevant contractual provisions constituted an absolute ban on deleting any computer files containing KT information, especially when such deletion would not deprive KT of such information and, in some cases, the files remained available elsewhere on the same computer. However, even if that is what the contracts mean, the evidence on record does not conclusively establish that Chen used EE to delete files containing confidential KT information. The court recognizes that, by its nature, EE makes it difficult or impossible to determine what it deleted, and its mere use may be suggestive of

1    wrongdoing.  However, while a jury may be able to infer that confidential information was deleted,

2    summary judgment on the issue is inappropriate.

3    The court finds only two indications of what may have been deleted by EE: (1) the forensic

4    examiner's finding that "a large number of files appear[ed] to have been deleted" by EE, including

5    "documents, email, and files related to internet history," Mock SJ Decl. ¶¶ 11, 24; and (2) KT's

6    security team's report that "substantial information, data and documents typically found on a former

7    employees's computer were not present on [Chen's] computer," Schmidt SJ Decl. ¶¶ 16, 27.  There is

8    no discussion by the forensic examiner of the identity of any deleted files other than the missing link

9    files, which do not contain substantive data.  Chen asserts that she only used EE to delete private,

10   personal information.  Chen Decl. ¶ 5.  Both Chen's account and plaintiff's contention that she

11   deleted KT information are consistent with the evidence before the court.  Thus, there remains a

12   genuine issue of material fact.  Thus, summary judgment on Count One is denied.

13   **D.        Count Two: Violation of the ECPA**

14   The Stored Communications Act ("SCA"), 18 U.S.C. §§2701-2712, part of the ECPA,

15   creates liability for an individual who

     (1) intentionally accesses without authorization a facility through which an electronic
16        communication service is provided; or

17   (2) intentionally exceeds an authorization to access that facility;

18   and thereby obtains, alters, or prevents authorized access to a wire or electronic
19        communication while it is in electronic storage in such system . . . .

20   *Id.* § 2701(a).  "Electronic storage" refers to both temporary, intermediate storage incidental to

21   electronic transmission and storage for purposes of backup protection.  *Id.* § 2510(17).  The SCA

22   creates a private cause of action for persons aggrieved by any violation.  *Id.* § 2707(a).  Plaintiff

23   argues that Chen violated the SCA by deleting the e-mails in their e-mail accounts before leaving the

24   company.

25   As an initial matter, it is not clear to the court that e-mails on KT's server were in "electronic

26   storage" within the meaning of the SCA.  In *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir.

27   2004), the Ninth Circuit held that messages remaining on an ISP's server after delivery could fall

28   within the SCA.  The court found that "[a]n obvious purpose for storing a message on an ISP's server

United States District Court
For the Northern District of California

after delivery is to provide a second copy of the message in the event that the user needs to download it again–if, for example, the message is accidentally erased from the user's own computer." *Id.* However, "the mere fact that a copy *could* serve as a backup does not mean it is stored for that purpose." *Id.* at 1076. The court noted that there would be instances where an ISP could hold messages not in electronic storage, such as "messages a user has flagged for deletion from the server." *Id.* In an apparent attempt to mirror *Theofel*'s language, plaintiff suggests that its server's storage of e-mail has a backup purpose because a user could "download them again when, for instance, his or her e-mails are accidentally deleted from the computer while working in an offline mode." Gurule SJ Decl. ¶ 7. However, plaintiff also explains that the server's software "is configured to synchronize a user's e-mail account so that the account contains the same set of e-mails regardless of where it is accessed." *Id.* ¶ 10. It seems to the court that these two purposes cannot coexist. Either the server is linked to the computer and flags for deletion a message that is deleted on the computer, or it acts as a backup and would not automatically delete messages that are deleted on a computer. Under either theory, plaintiff's SCA claim fails. Even if the system's operation is as plaintiff describes, the fact that automatic deletion does not occur in the specific situation of a message being deleted while the computer is offline does not establish that the server stores e-mails for the purposes of backup protection rather than only for purpose of synchronization.

Plaintiff's claim also fails because it has not established that Chen acted intentionally. In other parts of the ECPA, courts have noted that the legislative history indicates that the term "intentional" is narrower than the dictionary definition and requires that the defendant have as a conscious objective the conduct or the causing of the result. *See, e.g.*, *In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003). The definitions section of the SCA suggests that its language should generally be interpreted consistent with the rest of the ECPA. *See* 18 U.S.C. § 2711 (adopting the definitions in § 2510). Here, by virtue of the way the KT set up its system, when Chen deleted the e-mails on their computers, the copies residing on KT's e-mail server were automatically deleted when the server synchronized with the computer. Plaintiff has presented no evidence that Chen was aware of the e-mail system's configuration or knew that their conduct would result in the deletion of

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STAY—No. C-09-01922 RMW
LJP

1   data on KT's server.[5]  Without such evidence, there remains a question of fact whether it was Chen's

2   conscious objective to delete e-mails from KT's server.  Even under a broader definition of

3   "intentional," the court cannot conclude as a matter of law that Chen acted intentionally.

4         Finally, plaintiff has not established that Chen's conduct was unauthorized.  Plaintiff asserts

5   that Chen was "without authorization or exceeded authorization to access these e-mails on KT's e-

6   mail server in [her] last days at KT because [she] did not have any legitimate business reasons for

7   doing so and [is] prohibited, as a condition of their employment, from unauthorized use of KT

8   information."  Motion at 22:15-19.  However, this claim is not supported by the evidence.  As an

9   initial matter, it appears that employees were generally authorized to use their own e-mail account.

10  *See* Gurule SJ Decl. ¶ 4; Joe Reply Decl., Ex. F at 1.4.6 ("Every KLA-Tencor stakeholder who uses

11  computers in the course of their regular job duties will be granted an Internet electronic mail address

12  and related privileges.").  The employment agreements cited by plaintiff in its motion only restrict

13  use of *confidential* information, *see* Schmidt SJ Decl., Ex. A, B, L, and plaintiff has provided no

14  evidence that the contents of the deleted e-mails were confidential or that deleting e-mails would

15  constitute "use."  In addition, Chen states that there was no company policy prohibiting her from

16  deleting her own e-mail.  Chen Decl. ¶ 8.  Thus, summary judgment on Count Two is denied.

17        **E.      Count Three: Trade Secret Misappropriation**

18        The Uniform Trade Secrets Act ("UTSA") as adopted by California provides remedies for

19  actual and threatened misappropriation of trade secrets.  Cal. Civ. Code §§ 3426 *et seq.*  "Under the

20  UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to

21  demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the

22  plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the

23  plaintiff."  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003).  A trade secret

24  is

25        information, including a formula, pattern, compilation, program, device, method,
          technique, or process, that:

26  _____

27  [5] Indeed, Chen states that she believed her e-mail would remain available to KT, as she had
    previously been able to recover accidentally deleted e-mails by contacting technical support.  Chen

28  Decl. ¶ 8.

1

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

2

3

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4

Cal. Civ. Code § 3426.1(d).

5

6        Plaintiff has not specifically identified what it considers a trade secret, instead referring to

7   broad categories of information and attaching various documents recovered from defendants'

8   computers.  On this record, the court cannot determine what is or is not a trade secret, and

9   consequently it is impossible to render summary judgment that any trade secrets were

10  misappropriated.  *See MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 523 (9th Cir. 1993)

11  (reversing grant of summary judgment where plaintiff asserted that it had trade secrets in its

12  diagnostic software and operating system but did not specifically identify what those trade secrets

13  were).  In addition, because of plaintiff's generalized discussion of its alleged trade secrets, plaintiff

14  has provided only conclusory testimony as to how this information derives independent value from

15  not being generally known.  Therefore, summary judgment as to Count Three is denied, but without

16  prejudice to a specification by plaintiff of the specific trade secrets misappropriated and the basis for

17  the conclusion that they are trade secrets.

18        In addition to relying on the evidence presented, plaintiff separately argues that InspecStar is

19  liable on the trade secret misappropriation claim because its assertion of Thompson's Fifth

20  Amendment rights in its answer was improper and therefore those allegations in the complaint

21  should be deemed admitted.  Rule 8(b)(6) of the Federal Rules of Civil Procedure provides that "[a]n

22  allegation . . . is admitted if a responsive pleading is required and the allegation is not denied."

23  Although not addressed by the rule, courts have held that a valid claim of privilege under the Fifth

24  Amendment does not constitute an admission but rather should be treated as a specific denial.

25  *Rogers v. Webster*, 776 F.2d 607, 612 (6th Cir. 1985); *National Acceptance Co. v. Bathalter*, 705

26  F.2d 924, 932 (7th Cir. 1983).  It is well established that a corporation cannot validly claim

27  protection under the Fifth Amendment.  *Braswell v. United States*, 487 U.S. 99, 102 (1988).

28  However, "a corporation nevertheless may be the unintended beneficiary of a corporate employee's

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STAY—No. C-09-01922 RMW
LJP                                                                                                                    14

personal invocation of the fifth amendment privilege." *Admiral Ins. Co. v. United States District Court*, 881 F.2d 1486, 1495 n.8 (9th Cir. 1988). In particular, Fifth Amendment protection may in effect be extended to corporate defendants where all of its individual representatives may be implicated in the alleged wrongdoing. *See Paul Harrigan & Sons, Inc. v. Enterprise Animal Oil Co.*, 14 F.R.D. 333, 334-35 (E.D. Penn. 1953). In *Paul Harrigan*, the court issued a protective order postponing discovery until the termination of a parallel criminal action. 14 F.R.D. at 335. With respect to the corporate defendants, the court found a "twofold problem" in that the information sought was in the knowledge of officers who had been indicted individually and all officers authorized to answer interrogatories had also been indicted individually. *Id.* at 334. The court held that compelling discovery under the circumstances would contravene the Fifth Amendment rights of the individual defendants. *Id.* at 335.

The analysis in *Paul Harrigan* seems to extend logically to a corporate defendant's ability to answer a complaint. Here, plaintiff has not challenged the individual defendants' invocation of the Fifth Amendment, and the court assumes it is proper. All evidence suggests that InspecStar is a small company primarily owned by individual defendants in this case.[6] Thompson is InspecStar's only known officer. Under these circumstances, requiring InspecStar to substantively answer the complaint would be tantamount to requiring an answer by one of the individual defendants in contravention of their personal Fifth Amendment rights. Thus, InspecStar's assertion of Thompson's Fifth Amendment privilege will be treated as a denial.

**F.    Count Eight: Breach of Contract**

Under California law, breach of contract is established by showing (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages. *Shanghai Automation Instrument Co.*, 194 F. Supp. 2d 995, 1004 (N.D. Cal. 2001) (citing *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731 (2001)). Plaintiff has presented evidence that Chen signed an agreement in connection with her employment at KT and that KT did employ her. The

---

[6]   Although Thompson has since been dismissed from this case pursuant to a settlement agreement, that does not of course have any bearing on whether he is exposed to potential criminal liability for the same underlying conduct.

United States District Court
For the Northern District of California

1  court finds this sufficient to establish that a contract existed and was performed by KT.  Plaintiff

2  argues that Chen breached the provision in her contract requiring her to return and to not retain any

3  confidential KT information upon termination of her employment with KT.

4  Plaintiff has presented evidence that information obtained from KT was found at Chen's

5  apartment after she was terminated, including a part drawing with a notice that "this drawing

6  contains proprietary information" and what appear to be presentations that are marked

7  "confidential."  Joe Reply Decl. ¶¶ 2, 5, 7, Ex. A, D-E.  Thus, it appears that Chen retained

8  information defined in her contract as confidential information, in contravention of the provision

9  requiring her to return confidential material and her certification that she had done so.

10  However, plaintiff has not demonstrated that it was damaged by such conduct.  There is not

11  even a suggestion in the record that Chen used or disclosed any confidential information.  Nor does

12  plaintiff contend that it was deprived of use of any of the information retained by Chen.  Thus,

13  plaintiff has not conclusively established breach of contract by Chen, and summary judgment as to

14  Count Eight is denied.

15

16  **III. ORDER**

17  For the foregoing reasons, the court denies defendants' request for a stay and denies

18  plaintiff's motion for partial summary judgment without prejudice to a specification by plaintiff of

19  the specific trade secrets misappropriated and the basis for the conclusion that they are trade secrets.

20  A case management conference is hereby set for July 23, 2010 at 10:30 a.m.  The parties shall file a

21  joint case management conference statement on or before July 14, 2010.

22

23  DATED:      5/11/10                          *Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

24

25

26

27

28

**Notice of this document has been sent to:**

**Counsel for Plaintiff:**

Carla Beth Oakley                coakley@morganlewis.com
Ahren Christian Hoffman          ahoffman@morganlewis.com
Rita Emily Tautkus               rtautkus@morganlewis.com


**Counsel for Defendants:**

Diego F. Acevedo                 dacevedo@fbm.com
James Antone Lassart             jlassart@ropers.com


Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.


**Dated:**    5/11/10                              CCL
                                      **Chambers of Judge Whyte**

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STAY—No. C-09-01922 RMW
LJP                                      17